UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

YOLANDA LONDON, o/b/o B.L.,      )
                                 )
                Plaintiff,       )
                                 )
        v.                       )      No.  4:05CV1759 FRB
                                 )
MICHAEL J. ASTRUE,[1]            )
Commissioner of Social Security, )
                                 )
                Defendant.       )

## MEMORANDUM AND ORDER

This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.  All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On June 24, 2003, plaintiff Yolanda London filed an
application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.,
on behalf of her thirteen-year-old son, B.L., in which plaintiff
claimed that B.L. became disabled on June 7, 2003.  (Tr. 69-71.)[2]

---

[1]Michael J. Astrue became Commissioner of Social Security on
February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules
of Civil Procedure, Michael J. Astrue is substituted, therefore,
for Former Commissioner Jo Anne B. Barnhart as defendant in this
cause.

[2]In the written administrative decision in the instant cause,
the Administrate Law Judge (ALJ) refers to a previous application
for Supplemental Security Income filed on November 30, 1995, by
plaintiff on behalf of her son B.L., which was denied on initial
review and not pursued further by plaintiff.  (Tr. 13.)  The

On initial consideration, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 26, 60-63.) On February 15, 2005, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 298-343.) Plaintiff testified and was represented by counsel. B.L. also testified at the hearing. On April 25, 2005, the ALJ issued a decision denying plaintiff's claim for benefits. (Tr. 10-25.) On August 4, 2005, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 5-8.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on February 15, 2005, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that she believed B.L. was disabled due to attention deficit hyperactivity disorder (ADHD), depression, a learning disorder, and a conduct disorder. Plaintiff testified that B.L. had no physical impairments. (Tr. 302.) Plaintiff testified that B.L. had been undergoing counseling for his mental conditions for two years and also takes medication. (Tr. 302-03.)

Plaintiff testified that B.L. has difficulty with homework in that he does not complete assignments after starting

---

plaintiff does not challenge the ALJ's determination here not to reopen that application.

them, and that B.L. has failed to turn in any assignments in some classes. (Tr. 305, 306.) Plaintiff testified that she or her sisters sometimes help B.L. with his homework, which helps him focus if he enjoys the material. (Tr. 306-07.) Plaintiff testified that none of B.L.'s school materials are organized. Plaintiff testified that B.L. receives assistance in two classes. (Tr. 305.) Plaintiff testified that B.L. can read and write. (Tr. 308.) Plaintiff testified that she was aware that B.L. has never flunked any grades and received excellent grades in Math in 2003; and agreed that B.L. is capable of focusing, paying attention and doing the work required in class when he enjoys the subject. (Tr. 320.)

Plaintiff testified that B.L. is unable to complete tasks at home unless she follows through with him and continually instructs him to perform the task. (Tr. 305-06.) As an example, plaintiff testified that she usually must ask three times before B.L. takes out the trash and that it may take B.L. three or four minutes to complete the task. (Tr. 305-06, 307.) Plaintiff testified that B.L. understands what is being asked of him, but becomes distracted while performing the task. (Tr. 309.) Plaintiff testified that B.L. is easily distracted by the telephone, television or other activity. Plaintiff testified, however, that B.L. is not distracted while watching television and that he can watch a program he enjoys until he falls asleep. (Tr.

306.) Plaintiff testified that B.L. can share simple stories or ideas with her, but becomes confused when the stories are long. (Tr. 308.)

Plaintiff testified that B.L. can go the store alone. Plaintiff testified that B.L. travels alone on the bus to Northwest Plaza two or three times a month to meet and visit with a girl named Courtney. (Tr. 307-08, 311.) Plaintiff testified that B.L. is able to cook noodles and attempts more complicated cooking tasks with his grandmother at her house. (Tr. 309.) Plaintiff testified that B.L. is able to dress himself and take care of his personal hygiene. (Tr. 310.)

Plaintiff testified that B.L. is generally friendly and tries to be friendly with everyone. Plaintiff testified that B.L. has had previous difficulty with other children from school but that he has not been involved in any fights at school since he started high school. (Tr. 310, 315.) Plaintiff testified that people telephone the house for B.L. (Tr. 311.) Plaintiff testified that B.L. tries to talk back to her, but that she does not tolerate the behavior. Plaintiff testified that B.L. does not yell too much at his grandmother and that she likewise does not tolerate such behavior. Plaintiff testified that B.L. yells at her sisters, and that they just yell back at him. (Tr. 312.) Plaintiff testified that B.L. sometimes yells at his younger cousins but also sometimes get along with them. (Tr. 315.)

Plaintiff testified that B.L. talks back to his teachers. (Tr. 313.)

Plaintiff testified that B.L. is late to school almost every day and does not get to class on time because he either forgets his ID, does not take the bus, oversleeps, or cannot make it from his locker to his classroom in a timely fashion. (Tr. 313-14.) Plaintiff testified that, in actuality, B.L.'s classrooms are all located very near his locker. Plaintiff testified that she punishes B.L. for lying by removing telephone or television privileges, but that she punishes him only once a week because she does not like to punish him. Plaintiff testified that B.L. is punished at school for not following school rules and that he receives in-school suspensions or after-school detentions at least three times a week. (Tr. 314-15.)

Plaintiff testified that she works six days a week generally from 9:00 a.m. to 5:00 p.m. (Tr. 319.) Plaintiff testified that her mother, who is bedridden, lives around the corner from their house and that B.L. will stop by her house on his way home from school. (Tr. 315-16, 319.) Plaintiff testified that when she works on weekends, B.L. goes to her mother's house and cares for her. (Tr. 315-16.)

Plaintiff testified that B.L.'s medication makes him sleep a lot and that B.L. sleeps all day if he does not have to get up for school. Plaintiff testified that teachers have reported to

her that B.L. sleeps in class, but that such reports came before the medication dosage was increased. (Tr. 316.) Plaintiff testified that she tries to give B.L.'s medication to him at nighttime so that he gets more sleep during the night. (Tr. 316-17.) Plaintiff testified that B.L. now goes to bed at 10:00 or 11:00 p.m., gets up for school at 5:00 or 6:00 a.m., and sleeps in on the weekend till 1:00 or 2:00 p.m. (Tr. 317.)

B.    Testimony of B.L.

B.L. testified that he is fifteen years of age and currently in the ninth grade in high school. (Tr. 300, 321.) B.L. testified that his favorite class is Pre-Algebra which he takes through the Special School District. (Tr. 321.) B.L. testified that there are about ten or eleven students in the class and that the teacher helps him if he does not understand a certain problem. B.L. testified that he is able to complete his math homework in class because he knows most of it. (Tr. 322.) B.L. testified that Math is his only resource class. (Tr. 332.) B.L. testified that his least favorite class is Science because of the confusing subject matter such as mass, velocity, and calculating rates of speed. (Tr. 322-23.) B.L. testified that he tries to get extra help from his teacher but that she usually is unavailable. (Tr. 323.) B.L. testified that he understands what is expected of him in English, but that he does not understand the book they are presently reading and forgets information if there is a day off

between classes. (Tr. 334-35.) B.L. testified that he enjoys reading books which interest him. (Tr. 335.) B.L. testified that he is able to read and write and can use the library at school. (Tr. 323-24.)

B.L. testified that if he does not understand work he is supposed to do for school, he puts it aside and then loses it. B.L. testified that he loses his work between his house, his grandmother's house and his aunt's house. (Tr. 329.) B.L. testified that he goes to his grandmother's house nearly every day and to his aunt's house once or twice a week when he feels like walking the two blocks to her house. (Tr. 329.)

B.L. testified that he walks three blocks to school. (Tr. 323.) B.L. testified that he gets punished at school with detention for wearing his coat in a certain teacher's classroom and for talking back to that teacher. (Tr. 324.) B.L. testified that he talks back to teachers every day. (Tr. 339.) B.L. testified that his mother sometimes punishes him for engaging in such behavior by denying him telephone privileges. (Tr. 324-25.) B.L. testified that he is usually on the telephone from the time he gets home from school until he goes to bed. (Tr. 325.)

B.L. testified that his mother asks him to perform certain chores, such as washing the dishes, taking out the trash, and keeping his room and bathroom clean. (Tr. 325-26.) B.L. testified that when he washes the dishes, he washes only those that

are in the sink and forgets to walk around the house to collect others that may need washed. (Tr. 325.) B.L. testified that when his mother asks him to perform other chores, he becomes distracted by a telephone call or a visitor to the door who asks him to come outside, and then forgets to do the chore when the distraction has ended. B.L. testified that he talks back to his mother only when he thinks he is right. (Tr. 326.)

B.L. testified that he is able to ride the Bi-State bus and travels almost every weekend to visit Courtney, his "significant other," either at Courtney's house or at a shopping mall. B.L. testified that he does this only when he has money. (Tr. 327.) B.L. testified that he earns money by cleaning his aunt's car or babysitting his aunt's six-year-old son. (Tr. 327-28.) B.L. testified that he watches the boy almost every day because the bus drops him off in front of their grandmother's home. B.L. testified that he helps the boy with his homework. (Tr. 328.)

B.L. testified that his medication has made no difference in his distraction level at school. B.L. testified that there is too much going on in the classroom and that he becomes distracted with passing notes to and talking with other students. B.L. testified that such distractions cause him not to understand what the teacher is saying. (Tr. 330.) B.L. testified that he gets frustrated when he does not understand something in class and basically gives up. B.L. testified that he will then close his

binder and continue to talk and pass notes with his friends in class. (Tr. 330, 332.) B.L. testified that he does not have trouble at school socially because he has more friends than enemies. (Tr. 330-31.) B.L. testified that he has trouble with some kids in the neighborhood because he fought their friend when he was in the seventh and eighth grades, but that he nevertheless continues to walk around the neighborhood and is not scared. (Tr. 331.)

B.L. testified that he has problems getting along with his family and that he believes it stems from him wasting his money to visit his significant other on the weekends. B.L. testified that his significant other is actually a young man and that his mother does not want to get to know him. (Tr. 336.) B.L. testified that his stepfather used to live at the house but that he just recently left after an altercation with B.L. and his mother. (Tr. 337-39.) B.L. testified that he did not have a problem with his stepfather, but that his stepfather did not like who he went with. (Tr. 339.)

B.L. testified that he talks to his therapist but that the therapist primarily focuses on one subject, and that is B.L.'s desire to be cool in school. (Tr. 337.) B.L. also testified that he recently began a new medication and that he has seen a difference in his behavior at home in that he does not have confrontations with his aunts as he used to. B.L. testified that

he has seen no change in his behavior at school.  (Tr. 341.)

### III.  Medical and Counselor Records

The record shows that in August 1998 and August 1999, B.L. visited his primary physician, Dr. Michael Spezia, for school physicals and immunizations.  (Tr. 214-15.)  B.L. visited Dr. Spezia on February 3, 2003, for headaches and for small red bumps on his genitalia.  (Tr. 213.)  The record reflects no other treatment by Dr. Spezia.

B.L. was admitted to DePaul Health Center for psychiatric evaluation on June 4, 2003.  (Tr. 221-23.)  Dr. Rashid Zia noted B.L. to be thirteen years of age.  B.L. reported to Dr. Zia that his mother thought he was going to kill himself.  B.L. reported that he was very nervous and that his mother was threatening to put him in a home.  B.L. reported that he is being bad, has been suspended from school, and broke into his home on one occasion when he did not have a key which upset his mother.  B.L. reported that he usually does not feel sad and has no crying spells, death wishes or suicidal ideation.  B.L. reported his mother to work from 3:00 to 11:00 p.m. and that he spends his evenings with his mother's fiancé who lives with them.[3]  (Tr. 221.)  Dr. Zia noted an admission note to report that B.L. had started a fire in the kitchen the previous evening and that B.L.'s mother had reported

---

[3]A review of the record in its entirety shows plaintiff's fiancé and B.L.'s "stepfather" to be the same person.

B.L. to have been depressed for a couple of months and making suicidal statements; that B.L. is in special education classes and was failing all of his classes; and that B.L. was being made fun of at school, getting into fights and skipping classes. Mental status examination showed B.L.'s psychomotor activity to be somewhat increased mostly because of anxiety. B.L. was noted to be evasive, with a mood more anxious than sad, and an affect which was somewhat constricted. B.L. denied any suicidal or homicidal ideation, intent or plan. B.L.'s concentration and attention span were within normal limits as was his memory of recent, remote and immediate events. B.L.'s intellectual functioning appeared to be adequate and was within normal limits. Insight and judgment were noted to be fair. Dr. Zia diagnosed B.L. with depression not otherwise specified and conduct disorder not otherwise specified. B.L.'s Global Assessment of Functioning (GAF) was determined to be 35 at the time of admission. (Tr. 222.) Dr. Zia determined to treat B.L. with Zoloft[4] and to refer him for individual and group therapy. (Tr. 222-23.)

B.L. met with a counselor on June 5, 2003, and reported that he has had suicidal and homicidal ideations since March 2003 following a fight at school. B.L. reported that he has a bad relationship with his stepfather. B.L. reported that he goes to middle school, that his grades have fallen, that he has gotten into

---

[4]Zoloft is indicated for the treatment of depression. Physicians' Desk Reference 2553-54 (55th ed. 2001).

trouble, and has been suspended. (Tr. 226.) The counselor noted B.L.'s affect to be flat, but that B.L.'s thoughts were logical and connected. (Tr. 227.)

On June 6, 2003, B.L. met with a behavioral therapist who noted B.L. to be very sarcastic and to be aggressive when angry. B.L. denied any problems and reported that he was leaving the hospital soon. B.L. was noted to refuse to answer most questions and to refuse to complete paperwork to gain privileges. (Tr. 225.)

B.L. was discharged from DePaul Health Center on June 7, 2003. B.L. was prescribed Zoloft and Risperdal[5] upon discharge and was instructed to continue with outpatient therapy. (Tr. 219.)

B.L. and his mother visited Licensed Psychologist Peter Florian on June 13, 2003. (Tr. 265-70.) It was reported that B.L. was having trouble at school. It was noted that B.L. had received between twenty and forty detentions and seven three-day suspensions. It was noted that frequent notes were sent home from school during B.L.'s first- and second-grade years regarding B.L.'s behavior. (Tr. 265.) It was noted that Dr. Spezia had previously prescribed medication for B.L. but that plaintiff stopped giving B.L. the medication "in short order" because it made him "zoned out." (Tr. 265-66.) Dr. Florian noted that B.L. had not taken any medication since third grade. It was reported that B.L. was bad

_____

[5]Risperdal is indicated for the management of the manifestations of psychotic disorders. Physicians' Desk Reference 1453-54 (54th ed. 2000).

with homework and that his worst subject was Math.  It was reported
that B.L. was "pretty good" in English.  It was noted that B.L.
liked Physical Education and street basketball.  It was reported to
Dr. Florian that B.L. does not listen, despite numerous
repetitions.  (Tr. 266.)  It was also noted that B.L. is forgetful,
disorganized, impatient, forgets to turn in homework, and hates
tedious reading.  (Tr. 266-67.)  Dr. Florian noted B.L. to be
hyperactive in that B.L. would not sit still.  (Tr. 267.)  It was
noted that B.L. had shoplifted on a couple of occasions.  Dr.
Florian noted there to be "no big stress" with B.L.  (Tr. 269.)
Dr. Florian diagnosed B.L. with ADHD, combined type, and assigned
B.L. a GAF score of 52/60.  Dr. Florian instructed that B.L.
continue with cognitive behavioral therapy, parenting evaluation,
and medical management with Dr. Zia.  (Tr. 270.)

On July 1, 2003, Dr. Florian noted B.L. to be taking
Zoloft and Risperdal.  It was noted that B.L. had been attending
summer school and had had no behavioral problems.  It was also
noted that B.L. had begun attending his aunt's church.  (Tr. 264.)

On July 15, 2003, Dr. Florian noted B.L.'s mother to be
a bit negative and that B.L.'s grandmother was much more
supportive.  Dr. Florian noted, however, that B.L. was impatient
and cannot take "no."  (Tr. 264.)

B.L. returned with his aunt to Dr. Zia on July 17, 2003,
and reported that he felt well and had no sadness.  B.L.'s sleep

was noted to be okay.  (Tr. 254.)  Dr. Zia continued to prescribe Zoloft and Risperdal for B.L.  (Tr. 255.)

On July 29, 2003, B.L. returned to Dr. Florian who noted B.L.'s continued medications.  It was noted that B.L. was staying with his grandmother.  It was also noted that B.L. argues with his aunts about his use of the telephone in that he is on the telephone until 3:00 or 4:00 a.m. and then sleeps until 2:00 or 3:00 p.m. (Tr. 263.)

B.L. returned to Dr. Florian on August 13, 2003.  It was noted that B.L. spends hours on the telephone daily or obsesses about things he wants to buy.  It was noted that B.L. constantly persists and nags for people to take him shopping or to buy him things.  It was noted that B.L. dislikes school and homework.  Dr. Florian noted plaintiff's reactions to be quite flat and that she turned a deaf ear to B.L.'s feelings, "perhaps as a defense to his onslaughts."  (Tr. 263.)

On August 27, 2003, Dr. Florian noted B.L. to continue to obsess about things to buy.  B.L. reported school to be going well. It was noted that B.L. did not get along with his stepfather, and that he had recently moved to his grandmother's house.  (Tr. 262.)

B.L. missed a scheduled visit with Dr. Florian on September 10, 2003.  (Tr. 262.)

B.L. returned with his mother to Dr. Zia on September 24, 2003, who noted B.L. to have bad grades in school.  It was reported

that B.L. argues and does not listen.  Dr. Zia noted B.L. to have a better relationship with his mother's fiancé.  No depression was noted.  It was noted that B.L. is out all evening with friends.  (Tr. 254.)  Dr. Zia continued to prescribe Zoloft and Risperdal for B.L.  (Tr. 255.)

On October 8, 2003, Dr. Florian noted that B.L. was not getting to class on time and was forgetful of his appointments.  It was noted that B.L. was late to school nearly three times each week and receives one detention for each tardy.  (Tr. 261.)

On October 22, 2003, Dr. Florian noted B.L. to owe five or six detentions and that he was late to class two to five times weekly.  It was noted that Zoloft and Risperdal were not helping B.L. focus.  It was noted that B.L. previously went to summer school, but that B.L. did not care and could not make himself read.  Dr. Florian noted B.L. not to have any patience and that B.L. was not motivated to change.  (Tr. 260.)

On November 12, 2003, Dr. Florian noted that B.L. was back at home after having been at his grandmother's house for three weeks.  It was noted that B.L. does not talk with his stepfather.  Dr. Florian noted that B.L. would soon be in need of prescription refills.  (Tr. 260.)

B.L. returned with his mother to Dr. Zia on November 19, 2003.  It was noted that B.L.'s grades were down and that B.L. did not listen and was defiant.  It was noted that B.L. is late to all

of his classes and that his teachers continually call.  It was noted that no fighting had occurred in school.  It was reported to Dr. Zia that B.L. argues a lot and is always at the wrong place. (Tr. 253.)  Dr. Zia continued B.L. on Zoloft and Risperdal and determined to add Adderall[6] to the medication regimen.  (Tr. 252.)

B.L. returned to Dr. Florian on December 4, 2003, who noted B.L. to have been suspended from school for one week due to writing sexual notes to a girl.[7]  Dr. Florian noted B.L.'s additional medication.  (Tr. 259.)

On December 23, 2003, B.L. missed a scheduled appointment with Dr. Florian.  (Tr. 259.)

B.L. returned with his stepfather to Dr. Zia on January 8, 2004.  Things were noted to be "terrible."  It was reported that B.L. is defiant and gets into fights with his uncle who drinks.  It was reported that B.L. is tardy to class and disrupts class by getting up and talking to other students.  It was noted that B.L. stays up all night, lying in bed listening to the radio.  (Tr. 253.)  Dr. Zia determined to increase B.L.'s dosage of Adderall. (Tr. 253, 291.)

B.L. returned with his mother to Dr. Zia on March 3,

---

[6]Adderall is an amphetamine product indicated as part of a total treatment program for Attention Deficit Disorder with Hyperactivity.  Physicians' Desk Reference 3034 (55th ed. 2001).

[7]A review of B.L.'s school records from this time period shows B.L. to have been suspended for writing two notes to a sixth grade boy in which B.L. sought a relationship with the boy, and that B.L. had requested to perform oral sex on the boy.  (Tr. 117.)

2004.  It was noted that B.L. had had forty detentions during the school year for playing in the halls, talking, not going to class, and passing notes.  It was noted that B.L. currently lived with his maternal grandmother.  Dr. Zia noted B.L. to engage in constant talking and joking.  (Tr. 251.)  B.L. was prescribed Zoloft, Seroquel,[8] Tenex,[9] and Adderall.  (Tr. 250.)

On March 31, 2004, B.L. returned to Dr. Zia who noted B.L. to be alert, oriented and focused.  It was noted that B.L. was trying to do well in school but was finding it very hard.  B.L.'s sleep and appetite were noted to be good.  Dr. Zia found B.L. to be motivated in academics.  (Tr. 251.)  B.L.'s prescriptions were refilled.  (Tr. 250.)

B.L. underwent a psychological evaluation for Disability Determinations on June 2, 2004, during which B.L. performed tasks on the Wechsler Intelligence Scale-III and the Vineland Adaptive Behavior Scales.  (Tr. 236-43.)  B.L. was fourteen years, ten months of age at the time of the evaluation.  Licensed Psychologist Paul W. Rexroat noted B.L. to be cooperative, friendly, relaxed, and comfortable.  B.L. recalled and understood instructions without apparent difficulty.  B.L. appeared to increase his level of effort with difficult tasks and showed good persistence and attacked tasks

---

[8]Seroquel is indicated for the management of the manifestations of psychotic disorders.  Physicians' Desk Reference 639-40 (55th ed. 2001).

[9]Tenex (Guanfacine) is indicated in the management of hypertension.  Physicians' Desk Reference 2719 (55th ed. 2001).

without the need for encouragement. (Tr. 236.) Dr. Rexroat observed B.L. to display an average level of gross motor activity and to be calm and controlled during testing. Dr. Rexroat opined that emotional factors appeared not to affect B.L.'s performance. B.L.'s verbal IQ was measured to be 62; performance IQ was measured to be 54; and full scale IQ was measured to be 54. (Tr. 237.) Dr. Rexroat determined, however, that the results of the evaluation were not valid given B.L.'s placement in a regular classroom. (Tr. 236-37, 241-42.) Mental status examination showed B.L. to be well oriented. B.L. was not suspicious, anxious, tense, or weepy. B.L. exhibited a normal range of emotional responsiveness and normal affect, with normal energy level. Dr. Rexroat noted B.L. to have been diagnosed with depression but that he did not appear to be depressed. Plaintiff reported that B.L. has crying spells every two weeks and mopes around. It was noted that B.L. sleeps a lot due to his medications. Plaintiff reported that B.L. was less hyper because of his medication regimen. (Tr. 240.) Upon conclusion of the evaluation, Dr. Rexroat diagnosed B.L. with major depression, recurrent, moderate, under good control with medication; ADHD, combined type, under fair control with medication; and oppositional defiant disorder. Dr. Rexroat determined B.L.'s measured IQ scores to be invalid and found B.L. to be functioning in the IQ range of 70 to 80. Dr. Rexroat determined B.L.'s current GAF score to be 60. Dr. Rexroat found

B.L. to have few limitations in his activities of daily living and only mild limitations in his social functioning. Dr. Rexroat further found B.L. to have marked limitations in his school functioning. (Tr. 242.)

B.L. and his mother returned to Dr. Zia on June 9, 2004. It was noted that B.L. had received a ten-day suspension from school prior to the end of the school year. It was noted that B.L. was non-compliant with his medications and wanted to stay up all night to watch television, cook and talk on the telephone. It was noted that B.L. was living with his grandmother and had no motivation to change. B.L. was instructed to return to Dr. Zia in two months. (Tr. 249.)

On June 15, 2004, Dr. Rexroat completed a Mental Medical Source Statement of Ability to Do Work-Related Activities in which he opined that B.L.'s impairments slightly affected his ability to understand, remember and carry out short, simple instructions. Dr. Rexroat opined that B.L. was moderately limited in his ability to understand, remember and carry out detailed instructions; and in his ability to make judgments on simple work-related decisions. (Tr. 244.) Dr. Rexroat further opined that B.L. was markedly limited in his ability to respond appropriately with the public and to supervision, co-workers and work pressures in a work setting. Dr. Rexroat found no other capabilities affected by B.L.'s impairments. (Tr. 245.)

On July 28, 2004, B.L. and his mother returned to Dr. Zia. It was noted that B.L. had lost his ninety-year-old great grandmother who "raised [him] and was there for [him] when [his] mother could not [be]." (Tr. 284.) Dr. Zia noted B.L. to have lost his medication two days prior. It was noted that B.L. would be going to ninth grade in a regular school. (Tr. 284.) B.L.'s prescriptions for Zoloft, Seroquel, Tenex, and Adderall were refilled. (Tr. 292.) B.L. was instructed to return in two months. (Tr. 284.)

On September 22, 2004, Dr. Zia noted B.L.'s sleep to have decreased. It was noted that B.L. was in the ninth grade in regular school but does not follow instructions. (Tr. 285.) B.L.'s medications were refilled and B.L. was referred back to Dr. Florian. (Tr. 285, 293.)

On October 3, 2004, Dr. Rexroat completed a Child's Functional Assessment form at the request of plaintiff's counsel. (Tr. 277-80.) In the area of Acquiring and Using Information, Dr. Rexroat opined that B.L. had moderate limitations in comprehending and following oral instructions and in responsively answering questions; and marked limitations in learning new material, applying previously learned material, applying problem solving skills, reading comprehension, expressing ideas in writing, and in solving math problems. In the area of Attending and Completing Tasks, Dr. Rexroat opined that B.L. had marked limitations in

remaining alert, controlling impulses, focusing and maintaining attention, carrying through and finishing activities, working without need of task redirection, maintaining pace, carrying out instructions, and avoiding being fidgety, overactive or restless. (Tr. 278.) In the area of Interacting and Relating with Others, Dr. Rexroat opined that B.L. had no or slight limitations in initiating conversations; moderate limitations in getting along with other children, avoiding fights with peers, obeying authority, taking turns in and maintaining a conversation, tolerating differences, and considering others' feelings and points of view; and marked limitations in following rules, avoiding temper outbursts, and in his ability not to be disruptive or talk out of turn. Dr. Rexroat opined that B.L. had no limitations in the area of Moving About and Manipulating Objects. (Tr. 279.) In the area of Caring for Self, Dr. Rexroat opined that B.L. had no or slight limitations in avoiding harmful behaviors toward self, bathing and personal hygiene, sleeping, and using language sufficiently to express basic wants and needs; moderate limitations in his regard for safety rules; and marked limitations in his ability to cope with stress and ability to cope with change. Dr. Rexroat opined that B.L. has suffered such limitations since kindergarten. Dr. Rexroat noted B.L.'s most recent diagnoses to be major depression, recurrent, moderate, under good control with medication; ADHD, combined type, under fair control with medication; and oppositional

defiant disorder. Dr. Rexroat further indicated that B.L.'s current GAF score was 60. (Tr. 280.)

B.L. returned to Dr. Florian on October 5, 2004. It was noted that B.L. had been moody. It was also noted that B.L. had tried to improve his attitude during the previous month, but that it was later realized that he wanted a cell phone. Dr. Florian noted Dr. Zia to have discontinued Risperdal a few months prior and that B.L. was continued on Seroquel. Dr. Florian also noted, however, that B.L. does not take the Seroquel because he stays up all night to talk on the telephone. It was noted that plaintiff had begun "cracking down" with the telephone calls, but that B.L. now stays up to watch television. (Tr. 257.) It was noted that B.L. "crashes" to sleep after school. It was noted that plaintiff cut B.L.'s medication in half thinking the medication was making him tired during the day. It was noted that B.L. sleeps all weekend and that there was no noticeable effect from Adderall. (Tr. 258.) It was noted that B.L. has had detention since school started for fighting, being late for classes, talking, and for distracting others. It was noted that B.L. starts his homework but does not finish it. (Tr. 257.) Dr. Florian observed B.L. to be very antsy and hardly able to sit still. Dr. Florian noted B.L. not to listen and to have outbursts. (Tr. 258.)

On October 13, 2004, Dr. Florian noted B.L. to be disrespectful and rebellious with any rules from B.L.'s "soon to

be" stepfather.  Dr. Florian discussed ways B.L. could compromise without necessarily taking on the "dutiful son" role.  B.L. stated that he wished he could move to his grandmother's house.  (Tr. 256.)

On October 19, 2004, Dr. Florian completed a Child's Functional Assessment form at the request of plaintiff's counsel. (Tr. 271-74.)  In the area of Acquiring and Using Information, Dr. Florian opined that B.L. had moderate limitations in reading comprehension and responsively answering questions; and marked limitations in learning new material, applying previously learned material, applying problem solving skills, and in comprehending and following oral instructions.  In the area of Attending and Completing Tasks, Dr. Florian opined that B.L. had moderate limitations in remaining alert and in controlling impulses, and marked limitations in focusing and maintaining attention, carrying through and finishing activities, working without need of task redirection, maintaining pace, carrying out instructions, and avoiding being fidgety, overactive or restless.  (Tr. 272.)  In the area of Interacting and Relating with Others, Dr. Florian opined that B.L. had no or slight limitations in initiating conversations; moderate limitations in avoiding fights with peers, taking turns in and maintaining a conversation, and in tolerating differences; and marked limitations in getting along with other children, following rules, obeying authority, avoiding temper outbursts, considering

others' feelings and points of view, and in his ability not to be disruptive or talk out of turn. Dr. Florian opined that B.L. had no limitations in the area of Moving About and Manipulating Objects. (Tr. 273.) In the area of Caring for Self, Dr. Florian opined that B.L. had no or slight limitations in avoiding harmful behaviors toward self, bathing and personal hygiene, and using language sufficiently to express basic wants and needs; moderate limitations in his regard for safety rules, sleep, and coping with stress; and marked limitations in his ability to cope with change. Dr. Florian reported that B.L. has suffered such limitations throughout his school years. Dr. Florian noted B.L.'s most recent diagnosis to be ADHD, combined type, and that his current GAF score was 56. (Tr. 274.)

B.L. and his mother returned to Dr. Zia on October 20, 2004, who noted B.L. to be getting bad grades. It was noted that B.L. did not listen in school nor to his mother. Dr. Zia noted B.L. to be non-compliant with his medications and that he is up all night talking to a female, Courtney. (Tr. 286.) B.L.'s medications were refilled. (Tr. 293.) B.L. was referred to Dr. Florian and was instructed to return to Dr. Zia in three months. (Tr. 286.)

B.L. and his mother returned to Dr. Zia on January 5, 2005. It was noted that B.L.'s intake of medication was erratic and that he engaged in erratic behavior. Dr. Zia noted that B.L.

"takes his own medication." B.L. denied any abuse. B.L. was noted to be restless and fidgety. (Tr. 287.) B.L.'s prescriptions were refilled and B.L. was instructed to return in three months. (Tr. 287, 293.)

### IV. School Records

In February and March 2001, during B.L.'s fifth grade year, B.L. underwent evaluations at the request of his school to determine whether and to what extent he could participate in Special School District programs. (Tr. 166-73.) B.L. obtained a composite score of 84 on the Stanford-Binet Intelligence Scale which placed him in the below average range. (Tr. 168.) Results of the Wechsler Individual Achievement Test showed B.L. to perform at the second grade level in reading comprehension; at the third grade level in basic reading and numerical operations; and at the fourth grade level in math reasoning; with math and reading composites placing B.L. at the third grade level. (Tr. 168.) B.L.'s learning quotient score of 85 on the Learning Disability Evaluation Scale placed him in the average range. B.L.'s behavior quotient score of 79 on the Behavior Evaluation Scale placed him in the below average range. Results from the Attention Deficit Disorders Evaluation Scale placed B.L. in the fourteenth percentile. (Tr. 169.) In the areas of basic reading skills, reading comprehension and math reasoning, it was noted that B.L.'s skills were within or above cognitive expectancy. (Tr. 171.)

Visual tasks appeared to be very problematic for B.L. and adversely affected B.L.'s academic functioning. Upon conclusion of the evaluation, the evaluators determined that B.L. had a learning disability in the area of math calculation and to have intellectual functioning within the low average range of abilities. (Tr. 170.)

Records from Hoech Middle School show that during the 2001-2002 academic school year, B.L. was in the sixth grade and earned a B in Art; a D in Computers; D's and F's in Reading, English and Science; a D in French; A's in Boys Physical Education/ Health; C's, D's and F's in Social Studies and Math; and D's in Basic Skills. (Tr. 145.)

During the 2002-2003 academic school year, B.L. was in the seventh grade and earned a C in Computer; B's in Drama, Art and Music; a B and C in Basic Skills; a D in French; F's in Boys Physical Education/Health, Social Studies, and Reading; and a D and three F's in English. (Tr. 120, 145.) At the end of his seventh grade year, B.L. had a cumulative grade point average of 0.935. (Tr. 145.)

In an evaluation of B.L.'s Present Level of Educational Performance for the 2002-03 school year, it was noted that B.L. had been diagnosed in February 2001 with a learning disability in mathematics, weakness in visual processing and logical thinking, and low average cognitive ability. It was noted that B.L. had made some progress toward his goals but that he had difficulty following

school rules and preparing for class.  (Tr. 152.)  It was determined that B.L. would receive special education services in mathematics with small group instruction for 225 minutes per week. (Tr. 157-58, 164.)

On July 9, 2003, the Assistant Principal from Hoech Middle School completed a Teacher Questionnaire for Disability Determinations.  (Tr. 137-44.)  In this Questionnaire, it was opined that while presently in the seventh grade, B.L. was functioning at the fourth grade level in reading and written language, and at the fifth grade level in math.  It was noted that B.L. exhibited an unusual degree of absenteeism.  (Tr. 137.)  It was opined that B.L. had problems functioning in the area of Acquiring and Using Information in that B.L. had obvious problems in comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, and applying problem-solving skills in class discussions.  It was opined that B.L. had a serious problem in comprehending and doing math problems, expressing ideas in written form, learning new material, and in recalling and applying previously learned material.  (Tr. 138.)  In the area of Attending and Completing Tasks, it was opined that B.L. had no problem sustaining attention during play/sports activities; had a slight problem carrying out single-step

instructions; had obvious problems focusing long enough to finish an assigned activity or task, carrying out multi-step instructions, and changing from one activity to another without being disruptive; had serious problems paying attention when spoken to directly, refocusing to task when necessary, waiting to take turns, organizing his own things or school materials, completing work accurately without careless mistakes, working without distracting himself or others, and working at a reasonable pace/finishing on time; and had a very serious problem completing class/homework assignments. (Tr. 139.) In the area of Interacting and Working with Others, it was opined that B.L. had a slight problem in playing cooperatively with other children; had obvious problems following rules, relating experiences, telling stories, interpreting the meaning of facial and word expression and body language, and using adequate vocabulary and grammar to express thoughts/ideas in everyday conversation; had serious problems making and keeping friends, seeking attention appropriately, expressing anger appropriately, asking permission appropriately, respecting/obeying adults in authority, introducing and maintaining relevant and appropriate topics of conversation, and in taking turns in a conversation; and a very serious problem in using language appropriate to the situation and listener. (Tr. 140.) In the area of Caring for Himself, it was opined that B.L. had no problems in taking care of personal hygiene, caring for physical

needs, and in cooperating in or being responsible for taking needed medications; had slight problems in handling frustration appropriately, using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting personal needs, responding appropriately to changes in his mood, and using appropriate coping skills to meet daily demands of school environment; and obvious problems in being patient when necessary and in knowing when to ask for help. (Tr. 142.) It was opined that B.L. had no problems in the area of Moving About and Manipulating Objects. (Tr. 141.) The assistant principal concluded by observing that:

> [B.L.] often "wanders" in between classes, during lunch, etc. – he was seen almost daily in halls that were off limits, etc. He often decides when to go without asking or informing an adult. [B.L.] is dishonest in his discussions with adults. [B.L.] is almost obsessed with food (soda, candy, etc.). [B.L.] has been caught numerous times stealing from teachers and other students.
>
> [B.L.] has been doing very well at summer school.

(Tr. 144.)

Records from the 2003-2004 school year show B.L. to have been in eighth grade and to have earned D's in Reading; F's in English and Boys Physical Education; D's and F's in Science and Social Studies; C's in Seminar and Health; a B in Music; and a D in

Internet Project.  (Tr. 121.)  B.L. was noted to be making progress in Math during this same period, obtaining excellent or satisfactory evaluations from his Special School District educators.  (Tr. 114.)  On April 23, 2004, it was noted that B.L. was earning a C in Math.  (Tr. 123.)

From September 2003 to March 2004, during B.L.'s eighth grade year, B.L. had been punished with detention and/or school suspensions for engaging in unacceptable conduct including absenteeism, assault and battery, bus misbehavior, defiance of authority, disorderly conduct, fighting, harassment, improper language, movement outside of class, and sexual harassment.  (Tr. 94-99.)

On March 7, 2004, an Individualized Educational Program (IEP) was implemented for B.L. whereby B.L. would receive 12.5 percent of his schooling in a special education setting.  It was noted that B.L. had received an educational diagnosis of learning disabled as manifested by verbal harassment and threatening gestures and/or comments toward peers and educators.  (Tr. 100-06.)

Transcripts from B.L.'s ninth grade classes at Ritenour High School dated January 25, 2005, show B.L. to have earned a total of 0.5 credits.  (Tr. 76-77.)  B.L.'s Discipline Report from Ritenour dated January 25, 2005, shows that between September 1, 2004, and January 24, 2005, B.L. was punished with detention or in-school suspension on twenty-three occasions for having engaged in

unacceptable behavior including defiance of authority, absenteeism, and disorderly conduct.  (Tr. 81-82.)  B.L.'s Attendance Report from Ritenour shows B.L. to have been tardy to class or to have had unexcused absences from class on seventy-three occasions between August 18, 2004, and January 25, 2005.  (Tr. 83-85.)

## V.  The ALJ's Decision

The ALJ found B.L. not to have engaged in substantial gainful activity.  (Tr. 24.)  The ALJ found B.L.'s impairments of ADHD, learning disorder, depression, and conduct disorder to be severe but that such impairments or combination of impairments did not meet, medically equal, or functionally equal the severity of any impairment listed in of Appendix 1, Subpart P, Regulations No. 4.  (Tr. 20, 24.)  The ALJ found plaintiff's testimony not to be fully credible and found B.L.'s subjective complaints to be credible only to the extent they were supported by the record.  The ALJ determined that B.L. did not have a combination of impairments that resulted in marked or severe functional limitations, and that therefore B.L. was not functionally disabled.  The ALJ thus determined B.L. not to be under a disability at any time through the date of the decision.  (Tr. 24.)

## VI.  Discussion

A claimant under the age of eighteen is considered disabled and eligible for Supplemental Security Income under the Social Security Act if he "has a medically determinable physical or

mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe.  Finally, if the child's impairment(s) is severe, the Commissioner must determine whether such impairment(s) meets, medically equals or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the regulations.  20 C.F.R. § 416.924(a).  If the impairment(s) meets or medically equals a Listing, the child is disabled.  If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the Listings.  20 C.F.R. § 416.926a.  To functionally equal a listed impairment, the child's condition must result in an "extreme" limitation of functioning in one broad area of functioning, or "marked" limitations of functioning in two broad areas of functioning.  20 C.F.R. § 416.926a(a).  If this analysis shows the

child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled.  <u>Oberts o/b/o Oberts v. Halter</u>, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); <u>Young v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995) (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998).  In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision.  <u>Id.</u>  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  <u>Id.</u>

In this cause, plaintiff raises no issue relating to the Commissioner's determination that B.L.'s impairments do not meet or medically equal a listed impairment.  Instead, plaintiff argues that the Commissioner's determination that B.L.'s impairments do not functionally equal a listed impairment is not supported by substantial evidence inasmuch as the ALJ cited to only a few activities in which B.L. was not impaired to support her finding

that B.L. had less than marked limitations in the relevant broad areas of functioning.  For the following reasons, plaintiff's claim should be denied.

As set out above, when a child's severe impairments are determined not to meet or medically equal a Listing, the Commissioner is required to determine whether and to what extent the child's impairments affect broad areas of functioning as defined by the Regulations, and thus whether such impairments functionally equal a Listing.  To "functionally equal the Listings," the impairment must be of Listing-level severity, _i.e._, it must result in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  The domains are "broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1).  The six domains used by the Commissioner in making such a determination are:  1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being.  Id.  As such, to be determined disabled, a child-claimant must have an "extreme" limitation in one domain or a "marked" limitation in two domains.  20 C.F.R. § 416.926a(a).

Under the Social Security Regulations, a child-claimant has a "marked" limitation in a domain when his

> impairment(s) interferes seriously with [his]
> ability to independently initiate, sustain, or
> complete activities. [His] day-to-day
> functioning may be seriously limited when
> [his] impairment(s) limits only one activity
> or when the interactive and cumulative effects
> of [his] impairment(s) limit several
> activities. "Marked" limitation also means a
> limitation that is "more than moderate" but
> "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i).

A child will be found to have an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). In determining whether a child-claimant's functioning may be marked or extreme, the Commissioner reviews all the evidence of record and "compare[s] [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); see also 20 C.F.R. § 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how appropriately, effectively and independently [the child] perform[s] [his] activities compared to the performance of other children [the child's] age who do not have impairments."). Limitations in each domain will be considered by the Commissioner only if they "result from [the child's] medically determinable impairment." 20 C.F.R. § 416.926a(g)-(l).

A review of the ALJ's decision in this cause shows her to have thoroughly summarized all the evidence of record, including

B.L.'s school records and medical evidence obtained from DePaul Health Center, Dr. Zia, Dr. Rexroat, and Dr. Florian, and concluded that B.L. suffered less than marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others; and no limitations in the domains of Moving About and Manipulating Objects, Caring for Oneself, and Health and Physical Well-Being. Plaintiff contends, however, that the ALJ's determination that B.L. suffered less than marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others is not supported by substantial evidence on the record as a whole arguing that the ALJ's recitation of only a few non-impaired activities in each domain is an insufficient basis upon which to find B.L. not to suffer marked limitations throughout that domain.

In her discussion relating to each of the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others, the ALJ identified various of B.L.'s behaviors which demonstrate limited functioning, such as lack of motivation to attend school, behavioral problems at school, low to average intelligence, lack of focus, lagging attendance at school, lying, stealing, and fighting. (Tr. 20-21.) The ALJ observed, however, that the record showed that despite such adverse behaviors, B.L. nevertheless demonstrated positive

attributes in each of the domains.  Specifically, the ALJ found that in the area of Acquiring and Using Information, B.L. was able to read and write; was not primarily in a self-contained classroom; received only 12.5 percent of his education in a special educational setting; demonstrated reading skills, comprehension and math skills within or above cognitive expectancy on the Stanford-Binet Intelligence Scale Test; and showed little indication that he had deficits in learning and thinking.  (Tr. 20-21.)  In the area of Attending and Completing Tasks, the ALJ found that B.L. showed normal attention and concentration levels, and demonstrated fair judgment and insight during his hospitalization in 2003; obtained improving grades in Math; and demonstrated his ability to concentrate and focus when he wants to and when he takes his medication.  (Tr. 21.)  Finally, in the area of Interacting and Relating with Others, the ALJ found that B.L. was able to sustain social relationships with his peers; babysat on a daily basis; was cooperative and friendly with Dr. Rexroat and exhibited a normal range of emotional responses; took care of his personal hygiene; and performed chores.  In addition, the ALJ found that "a longitudinal review of the evidence also indicates that any behavioral disorder is volitional and is fully controllable by the claimant when he chooses to associate with his friends, behave in the presence of strangers, and associate with adults other than his mother."  (Tr. 21.)  These findings are supported by substantial

evidence on the record as a whole.

Significantly, throughout her opinion, the ALJ referred to B.L.'s continual non-compliance with his medication regimen as documented in the record by Dr. Zia and Dr. Florian. It is well established that a claimant's "failure to follow a prescribed course of treatment without good reason can be a ground for denying an application for benefits." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). A review of the record here fails to show good reason for B.L.'s failure to follow his prescribed course of treatment with psychotropic medications. Instead, it appears that B.L. chose to maintain his behavioral lifestyle by not taking his medication so that he could stay up at night to watch television or talk on the telephone. In addition, evidence in the record shows that, if and when given the opportunity, the prescribed medication may have improved B.L.'s impairments. Indeed, upon initially being prescribed such medication by Dr. Zia, the record shows B.L. to have performed well in school, to have exhibited no behavioral problems, to have slept well, and to have reported feeling well with no sadness. Impairments that are controllable or amenable to medication do not support a finding of total disability. Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729-30 (8th Cir. 2003); Kelley, 133 F.3d at 589. Dr. Zia observed later, however, that B.L.'s intake of medication was erratic and that his behavior was likewise erratic. Cf. Collins, 335 F.3d at 728-30 (when not taking

his medication, child-claimant was disruptive in class, disorganized, able to follow only basic instructions, hard to control, hit other children, threw things, did not pay attention in class, loud and belligerent, did not do what he was told, and performed two grades below current level).

While evidence in the record may exist to support a finding contrary to the ALJ's determination that B.L. experienced less than marked limitations in certain broad areas of functioning, substantial evidence nevertheless supports the ALJ's conclusion that B.L.'s functioning was less than markedly impaired, especially given the substantial evidence of B.L.'s continued failure to comply with his medication regimen which showed signs of improving B.L.'s impairments. See Collins ex rel. Williams, 335 F.3d at 730; see also Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005) (may not reverse merely because substantial evidence may support different outcome). In light of the above, there is substantial evidence on the record as a whole to support the ALJ's conclusion that, to the extent B.L.'s medically established impairment(s) resulted in any functional limitations in the domains of Acquiring and Using Information, Attending to and Completing Tasks, and Interacting and Relating with Others, such limitations did not rise to such a degree as to be considered "marked" or "extreme" limitations.

## VII. Conclusion

For the reasons set out above on the claim raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claim of error should be denied.[10]  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome, or because another court could have decided the case differently.  Neal ex rel. Walker, 405 F.3d at 688; Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that B.L. is not disabled should be affirmed.

---

[10]To the extent plaintiff raises new claims in her reply brief, the Court is aware that it has the discretion not to address them inasmuch as they do not supplement an argument supporting plaintiff's original claim.  See Barham v. Reliance Standard Life Ins. Co., 441 F.3d 581, 584 (8th Cir. 2006); Lorenzen v. GKN Armstrong Wheels, Inc., 345 F. Supp. 2d 977, 992 n.4 (N.D. Iowa 2004).  Nevertheless, a review of the claims show them to be without merit.  A review of the ALJ's decision shows the ALJ to have accorded appropriate weight to the opinion of Dr. Rexroat given Dr. Rexroat's one-time consultative examination of B.L. and in view of the other evidence of record from B.L.'s school records and treating sources.  See Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999) (opinion of consulting physician does not generally constitute substantial evidence); see also Anderson v. Barnhart, 344 F.3d 809, 812-13 (8th Cir. 2003) (exceptions under which greater weight may be accorded to the opinion of a consulting physician).  In addition, because the available evidence of record provided an adequate basis for determining the merits of B.L.'s disability claim, the failure of the ALJ to order additional consultative examinations was not error.  Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this  _7th_  day of March, 2007.